UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

DOVER LIMITED,                                    :
                                                  :
                                                  :      Case No. 07-Cv-11215(DLC)(FM)
                      Judgment Creditor,          :
                                                  :
          vs.                                     :      **DECLARATION OF**
                                                  :      **THOMAS M. MULLANEY**
A.B. WATLEY, INC., and A.B. WATLEY GROUP,         :
INC.,                                             :
                                                  :
                      Judgment Debtors.           :
                                                  :
-------------------------------------------------------------X

THOMAS M. MULLANEY declares the following pursuant to 28 U.S.C. § 1746, under

penalty of perjury:

1.      I am the attorney for Judgment Creditor Dover Ltd in this matter.  I submit this

declaration in support of objections to the Corrected Order of Magistrate Frank Maas, dated

March 10, 2008 (the "Order").

2.      I am fully familiar with the facts and circumstances set forth herein.  This

declaration is based upon my personal knowledge and my review of the relevant documents in

this case.

3.      A copy of the Corrected Order of Magistrate Frank Maas is attached as Exhibit A.

4.      A copy of the Settlement Agreement is attached as Exhibit B.

5.      A copy of the February 1, 2008 Letter of Thomas M. Mullaney is attached as

Exhibit C.

6.      A copy of the March 3, 2008 Letter of the Thomas M. Mullaney is attached as

Exhibit D.

7.     A copy of the March 6, 2008 Letter of the Watley parties' counsel is attached as Exhibit E.

8.     The attorneys for Dover and the Watley Defendants never even discussed limiting Dover's rights as a Judgment Creditor; we only agreed that Direct would not itself be liable for a breach of the Settlement Agreement.

9.     A Letter brief of the Watley parties dated December 22, 2006 is attached as Exhibit F.

10.    A copy of the Stipulation and Order of Discontinuance with Prejudice is attached as Exhibit G.

11.    A copy of relevant pertions of the deposition transcript of Janice Johnson is attached as Exhibit H.


I declare under penalty of perjury that the foregoing is true and correct. Executed on March 27, 2008.


THOMAS M. MULLANEY

Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------x

DOVER LIMITED,                 :

             Plaintiff,    :    **CORRECTED**

                    :    **ORDER**

                    :    07 Civ. 11215 (DLC)(FM)

      -against-          :

A.B. WATLEY, INC., et ano,     :

           Defendants.    :

----------------------------------------------------------x

**FRANK MAAS**, United States Magistrate Judge.

      Pursuant to a conference held March 6, 2008, it is hereby ORDERED that:

1.    The defendants' application for a protective order is granted, without prejudice to the service of a new a subpoena duces tecum on Ellenoff Grossman & Schole LLP requiring the production of documents relating to (a) the interrelationship between the defendants and A.B. Watley Direct ("Direct") and (b) the defendants' assets held by Direct. No such subpoena may be served, however, until the issue of whether the plaintiff has released Direct from any alter-ego liability has been resolved.

2.    Any restraining notice served on Direct shall restrain only the defendants' assets held by Direct. Additionally, the plaintiff shall not serve any restraining notice on any of the entities with which Direct does business, other than the defendants in this action.

3.    On or before March 20, 2008, any dispositive motions shall be served and filed.

4.    On or before April 10, 2008, any opposition papers shall be served and filed.

5.     On or before April 21, 2008, reply papers may be served and filed.

6.     The conference scheduled for March 27, 2008, is cancelled.

SO ORDERED.

Dated:     New York, New York
           March 10, 2008

                              _____
                              FRANK MAAS
                              United States Magistrate Judge

Copies to:

Honorable Denise L. Cote
United States District Judge

Thomas M. Mullaney, Esq.
Law Offices of Thomas M. Mullaney
(212) 661-9860 (fax)

Donald G. Davis, Esq.
Ellenoff Grossman & Schole LLP
(212) 370-7889 (fax)

Exhibit B

## SETTLEMENT AGREEMENT

This Settlement Agreement (the "Agreement") is entered into between and among Dover Limited, a Hong Kong corporation (hereinafter, "Plaintiff" or "Dover"), on the one hand, and A.B. Watley, Inc., a New York corporation (hereinafter, "Inc."), A.B. Watley Group, Inc., a Delaware corporation (hereinafter, "Group"), and A.B. Watley Direct, Inc., a Delaware corporation (hereinafter, "Direct"), both individually and collectively on the other hand ("Inc.," "Group," and "Direct" hereinafter sometimes collectively referred to as the "Watley defendants").

### RECITALS

WHEREAS, on or about June 20, 2006, Plaintiff filed a Third Amended Complaint against the Watley defendants and other parties in an action venued in the United States District Court for the Southern District of New York, Case No. 04 CV 7366, entitled *Dover Limited et al. v. A.B. Watley Group, Inc. et al.* (the "Lawsuit"), seeking to recover monies in connection with alleged losses in Plaintiff's account at Inc., in an amount of not less than $2,994,597.84, together with interest thereon, and also seeking punitive damages, costs, legal expenses and reasonable attorneys' fees in connection with the Lawsuit; and

WHEREAS, the Watley defendants filed an Answer denying any liability whatsoever; and

WHEREAS, Plaintiff and the Watley defendants have agreed to end their litigation and dismiss the Lawsuit, and settle their differences in consideration of the mutual promises contained in this Agreement; and

NOW, THEREFORE, in consideration of the promises and for other good and valuable consideration, the receipt of which is hereby acknowledged, the parties agree as follows:

1.    <u>Recitals</u>.      The foregoing Recitals are true and correct and are hereby made a part of this Agreement.

2.    <u>Payment</u>.      Group and Inc. only shall be jointly and severally responsible for any settlement payment obligations under this Agreement.  Group and Inc. will pay to Plaintiff, on or before December 31, 2010, the amount of $2,994,597.84 (the "Settlement Amount"), as follows:

(a)    The amount of $200,000 will be paid on or before October 15, 2007.

(b)    The amount of $300,000 will be paid on or before December 31, 2007.

(c)    During calendar year 2008, monthly minimum payments of $10,000 will be made, at or before the end of each month.

(d)    During calendar year 2009, monthly minimum payments of $15,000 will be made, at or before the end of each month.

(e)    During calendar year 2010, monthly minimum payments of $20,000 will be made, at or before the end of each month.

(f)    Group and/or Inc., as a further means of paying off the Settlement Amount, will also make lump sum payment(s) in the amount of fifteen per cent (15%) of any outside investment capital raised for the Group and/or Inc., such payment(s) to be made within ten (10) business days of the closing(s) on such capital raises. Any such payments by Group and/or Inc. referenced in this paragraph will reduce Group and Inc.'s total obligation under this Agreement.

(g)    The monthly minimum payments set forth in paragraphs 2(c), (d) and (e) above may, at Group or Inc.'s option, be increased at any time, as Group or Inc. anticipate the retirement of other periodic obligations and possible improvement in cash flow.  Group and Inc. further reserve the right at any time to prepay any or all of the outstanding balance of the

Settlement Amount due to Plaintiff. . Any such payments by Group and/or Inc. referenced in this paragraph will reduce Group and Inc.'s total obligation under this Agreement.

(h)     If requested by Plaintiff during a period commencing upon the effective date of this Settlement and ending on December 31, 2010, Group shall issue to Plaintiff (or Plaintiff's designees) warrants to purchase up to 500,000 shares of Group's Common Stock ("Warrants"), at a price of one cent ($.01) per warrant. The Warrants shall be exercisable for a period of three (3) years from the date of issuance and be exercisable in whole or in part. The holder of the Warrant shall be entitled to one "piggyback" registration right with respect to the underlying shares of Common Stock whereby Group, at its cost, shall include the underlying shares of Common Stock in the next registration statement filed by Group with the Securities and Exchange Commission so as to allow for the resale of the underlying shares by the holder in accordance with the Securities Act of 1933, as amended; provided, however, that Group shall not be required to include any such shares unless and until Plaintiff has instructed Group to issue the Warrants. Group shall provide twenty (20) days' notice to Plaintiff of Group's intention to file a registration statement so as to provide Plaintiff with time to determine whether to request issuance of the Warrants.

(i)     In addition, Group agrees to offer Plaintiff an equity interest in Group, to expedite the required payoff of the Settlement Amount and to enable Plaintiff an opportunity to earn additional returns as follows: In the event that the reported closing price of the common stock of Group is $1.00 or more per share during any calendar month and during such period there is an average monthly volume of 50,000 shares, Plaintiff shall have the right (but not the obligation) to convert, within five (5) days of the end of each such month up to $100,000 of the remaining total owed by Group and Inc. into shares of Group at the average closing value of the common

3

stock for such month (each such instance being a "Conversion"). Upon such Conversion, Plaintiff shall also receive common stock purchase warrants ("Conversion Warrants") with an exercise price of $.10 per share in an amount equal to 20% of the shares issued to Plaintiff under the Conversion. (Example: If 100,000 shares of Group were issued upon a Conversion, an additional 20,000 in warrants with an exercise price of $.10 would be granted.) These Conversion Warrants shall have an exercise term of three years from the date of issuance and shall provide for registration of the underlying shares of Common Stock as provided for in the Warrants to be issued under clause (h) above.

(j) With respect to any of the shares of Common Stock underlying the warrants under clause (g) above or issuable to Plaintiff upon conversion of the outstanding debt as provided in clause (h) above and the Conversion Warrants (all such shares of Common Stock being referred to as "Registrable Shares"), Group hereby agrees that the Plaintiff shall be entitled to the following registration rights:

(i)      Plaintiff shall be entitled to the "piggyback" registration rights described under clause (g) above for all of the Registrable Shares;

(ii)      Provided that the Common Stock of Group has a closing price of $1.00 or more for any thirty (30) consecutive trading days, Group shall file, within ninety (90) days of the end of such 30 day period, a registration statement on appropriate form, with the SEC to allow for Plaintiff to sell the Registrable Shares under the Securities Act of 1933, as amended; and

(iii)    In the event that the Registrable Shares have not been registered for resale on behalf of Plaintiff under clauses (i) or (ii) above by a date which is two years from the date of this Settlement Agreement, Group shall file a registration statement on appropriate form within ten (10) business days of such second anniversary date to allow for the resale of all of the Registrable Shares by the Plaintiff.

(k)    To the extent defendant Alain Assemi contributes to the settlement with Plaintiff, or any funds are recovered by Plaintiff from SIPC or related sources of insurance, or Plaintiff receives payment from Group as a result of monies recovered by Group from the action entitled *A.B. Watley Group, Inc. v. Administaff Companies II, L.P., No. 600871/2007* ("Administaff"), Plaintiff agrees that Group and Inc.'s total obligation under this Agreement will be reduced by such amounts. Group and Inc. shall pay to Plaintiff twenty-five percent of any recovery from Administaff. Any funds recovered by Group or Inc. from sources as described in this paragraph shall be paid to Plaintiff within ten (10)) business days.

(l)    Any outstanding balance of the Settlement Amount remaining unpaid on December 31, 2010 will be paid by Group and/or Inc. to Plaintiff on such date.

3.    <u>Dismissal of Lawsuit</u>.    Upon execution of this Agreement, including the Confession of Judgment referenced below and attached hereto, the parties to this Agreement shall dismiss the Lawsuit with prejudice.

4.    <u>Confession of Judgment</u>.    (a) Inc. and Group hereby confess to judgment for the amount of $2,994,597.84, minus any amounts paid pursuant to this Agreement (the "Confessed Sum"), and agree that the Confession of Judgment annexed hereto as Exhibit A may be held in escrow by Plaintiff's attorney. Plaintiff agrees that it will take no action to docket, execute or enforce such Confession of Judgment, or otherwise to seek collection of the

Confessed Sum, unless Inc. and Group default under this Agreement as further set forth below, in which event:

           (i)     Plaintiff may, after twenty-four (24) hours' notice given on any business day to Group and Inc., immediately docket and execute upon the Confession of Judgment and seek collection of the Confessed Sum against Group and Inc. in any lawful manner;

           (ii)    Plaintiff may exercise any other remedies available to it at law or in equity, if any; and

           (b)    In the event that it is determined that Plaintiff prematurely or without cause attempted to docket, execute or enforce the Confession of Judgment, or otherwise prematurely or without cause sought collection of the Confessed Sum, Group and Inc. shall be entitled to reimbursement of reasonable attorneys' fees and other costs required to oppose such wrongful action(s) by Plaintiff.

           (c) If the Group and Inc. fully perform under this Agreement without any defaults and without any cause for Plaintiffs to execute or enforce the Confession of Judgment, Plaintiff shall return the escrowed Confession of Judgment (and any copies thereof) to Group and Inc. within three (3) business days of the satisfaction of the Settlement Agreement.

    5.    <u>Defaults</u>. Group and Inc. shall be deemed to be in default of this Agreement only upon the occurrence of one or more of the following conditions:

           (a)    Group or Inc. fail to pay any installment of the Settlement Amount specified in paragraph 2 above by the due date, or otherwise fail to comply with paragraph 2 above. Notwithstanding the foregoing and the payment schedule set forth in paragraph 2 above, Group and Inc. are entitled to one (1) 30-day period to cure if Group or Inc. fail to pay any

installment of the Settlement Amount specified in paragraph 2 above by the due date, or otherwise fail to comply with paragraph 2 above ( *e.g.*, if Group or Inc. were to fail to make the second installment payment by December 31, 2007, then they could rely upon their right to make such payment within 30 days of December 31, 2007, but Group or Inc. would not have any such 30-day cure right with respect to any subsequent payments).

(b)    Group and/or Inc. file or petition a court of competent jurisdiction for protection under any laws relating to bankruptcy, insolvency, reorganization, or the relief of debtors.

(c)    Group and/or Inc. fail to make payments due as defined in paragraph 2(j), above.

6.    <u>No Waiver</u>.  No failure or delay on the part of Plaintiff in exercising any right, power or privilege hereunder nor course of dealing between Plaintiff and the Watley defendants shall operate as waivers thereof.  No single or partial exercise of any right, power or privilege shall preclude any other or further exercise of any right, power or privilege.

7.    <u>Representation by Counsel</u>.    Plaintiff and the Watley defendants (both individually and collectively) confirm that they had independent advice of counsel in connection with the negotiation and execution of this Agreement.

8.    <u>Confidentiality</u>.  The parties agree that, from the date of this Agreement forward, the terms of this Agreement and the Confession of Judgment, and the underlying claims out of which this dispute arose, shall be confidential and, neither they nor their agents, successors, assigns, attorneys, employees, executors, administrators, and beneficiaries will disclose the terms of this Agreement, or the underlying claims related to the dispute which led to this Agreement, to any person or entity not a party to the action, except to their attorneys and accountants as needed

for legal, tax or accounting purposes; as required by applicable laws; as ordered by a court or an arbitration tribunal of competent jurisdiction; as required by the FINRA or other self-regulatory organization; or pursuant to a duly authorized subpoena. This provision should not be construed to preclude either party from responding to any inquiry, or providing testimony, about the settlement or underlying facts and circumstances by, or before, any law enforcement, regulatory or self-regulatory organization, including, but not limited to the Securities and Exchange Commission or FINRA. Notwithstanding the foregoing, either party may disclose to a third-party, only in response to a direct question about the matters that are the subject of the litigation, that the matter has been resolved to the mutual satisfaction of the parties.

9.    <u>Entire Agreement</u>.  This Agreement and the documents delivered herewith constitute the entire and complete understanding among the parties and supersede any prior oral or written agreements between the parties not expressed herein. It is expressly agreed that there have been no verbal understandings or agreements which would in any way change the terms, covenants and conditions herein set forth and that no modification of this Agreement, or the annexed Confession of Judgment, and no waiver of their terms and conditions, shall be effective unless it is in writing and duly executed by Plaintiff and the Watley defendants.

10.    <u>Governing Law</u>.  This Agreement and the annexed Confession of Judgment shall be governed by the laws of the State of New York (without regard to the conflict of law rules of the State of New York). If any term in this Agreement shall be held to be illegal or unenforceable, the remaining portions of this Agreement shall not be affected, and this Agreement shall be construed and enforced as if this Agreement did not contain the term held to be illegal or unenforceable. The parties hereby irrevocably submit to the exclusive jurisdiction of the federal or state courts of the State of New York located within the County of New York

over any action or proceeding arising out of relating to this Agreement, and agree that all claims in respect to such action or proceeding shall be heard and determined in said Court(s).

11.   <u>Binding Effect, Assignment</u>.   This Agreement and the annexed Confession of Judgment shall be binding upon and inure to the benefit of the Plaintiff and the Watley defendants and their respective heirs, successors and assigns.

12.   <u>Construction of Agreement</u>.   Neither construction of this Agreement, nor any provision thereof, shall be affected in any manner by the fact that it was drafted by one side or the other.

13.   <u>Wire Transfer Instructions</u>.   Pursuant to paragraph 2 above, unless otherwise instructed by Plaintiff, Group and/or Inc. will direct any wire transfers constituting payments of the Settlement Amount to: North Fork Bank 1011 Third Ave., NY, NY 10021, ROUTING NO. 021407912; ACCOUNT NO. 9654006247; SWIFT NFBK US 33.; ACCOUNT NAME: Thomas M. Mullaney, Esq.

14.   <u>Notices</u>.   All notices and other communications provided for hereunder shall be in writing (including by facsimile or e-mail), and mailed, faxed or delivered:

a)   <u>If to Plaintiff</u>:

Wendy Sui Cheng Yap
as agent for Dover Limited
56 Andrew Road
299968
SINGAPORE
(By DHL only)

<u>with a copy to</u>:

For Plaintiff Dover Limited:
The Law Offices of Thomas M. Mullaney
Thomas M. Mullaney (TM-4274)
708 Third Avenue, Suite 2500

New York, NY 10017
(212) 223-0800 (tel.)
(212) 661-9860 (facsimile)
TMM@Mullaw.org

·b)    If to Defendants:

A.B. Watley Group, Inc.
c/o Steven Malin
50 Broad Street, Suite 1728
New York, New York 10004
Facsimile: (212) 202-5204

with a copy to:

Donald G. Davis, Esq.
Ellenoff Grossman & Schole LLP
370 Lexington Ave.
New York, N.Y. 10017
Tel: 212-370-1300
Fax: 212-370-0804
ddavis@egsllp.com

or, as to either party, at such other address as shall be designated by such party in a written notice to the other party. All such notices and communications shall, when mailed or faxed, be effective when deposited in the mails or transmitted by facsimile, respectively, addressed as provided above.

15.    Mutual Releases.  In consideration of the agreements contained herein:

(a)    Release by the Watley defendants.  Except for claims arising under this Agreement, which claims are hereby specifically retained, the Watley defendants, individually and collectively, for themselves and their officers, directors, employees, agents, attorneys, representatives, subsidiaries, shareholders, predecessors, successors and assigns, hereby release and forever discharge Plaintiff and each of its past, present and future officers, directors,

10

employees, agents, attorneys, representatives, subsidiaries, shareholders, predecessors, successors and assigns, of and from any and all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims, and demands whatsoever, in law, admiralty or equity, whether known or unknown, liquidated or unliquidated, fixed or contingent, direct or indirect, which the Watley defendants ever have, have had or ever can, shall or may have, or claim to have against Plaintiff and any of such past, present and future officers, directors, employees, agents, attorneys, representatives, subsidiaries, shareholders, predecessors, successors and assigns, upon or by reason of any matter, act or thing from the beginning of the world to the day of the date of this Agreement.

(b)    <u>Release by Plaintiff</u>.  Except for claims arising under this Agreement, which claims are hereby specifically retained, Plaintiff, for itself and each of its past, present and future officers, directors, employees, agents, attorneys, representatives, subsidiaries, shareholders, predecessors, successors and assigns, hereby release and forever discharges the Watley defendants and their past, present and future officers, directors, employees, agents, attorneys, representatives, subsidiaries, shareholders, predecessors, successors and assigns, of and from any and all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims, and demands whatsoever, in law, admiralty or equity, whether known or unknown, liquidated or unliquidated, fixed or contingent, direct or indirect, which Plaintiff or any of its past, present and future officers, directors, employees, agents, attorneys, representatives, subsidiaries, shareholders, predecessors, successors and assigns, ever has, has had or ever can, shall or may have, or claim to have against

11

the Watley defendants or their officers, directors, employees, agents, attorneys, representatives, subsidiaries, shareholders, predecessors, successors and assigns, upon or by reason of any matter, act or thing from the beginning of the world to the day of the date of this Agreement.

16.    Counterparts.    This Agreement may be signed by Plaintiff and the Watley defendants in counterparts, any of which shall be deemed an original, and all of which together shall constitute one and the same instrument, notwithstanding that all of the parties hereto are not a signatory to the original or the same counterpart.  Facsimile signatures shall have the same binding force and effect as original signatures.  This Agreement shall be deemed binding and in force upon each party hereto receiving from the others an executed counterpart.

17.    Additional Documents.  The Watley Defendants agree to sign such additional documents, and take all such action consistent with the terms of this Agreement, as are reasonably required to effect the intent and purpose of this Settlement Agreement.

18.    Representation and Warranty.   The signatories to this Settlement Agreement represent and warrant that they have the power and authority to sign and enter into this Settlement Agreement, and to bind their principals to the terms of this Settlement Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement as of this _____ day of October, 2007.

DOVER LIMITED

By: _____

12

Wendy Sui Chang Yap

A.B. WATLEY, INC.

By: _____
Robert Malin

A.B. WATLEY GROUP, INC.

By: _____
Steven Malin

A.B. WATLEY DIRECT, INC.

By: _____
Ralph Armenti

18.     Reprsentation and Warranty The signatories to this Settlement Agreement represent and warrant that they have the power and authority to sign and enter into this Settlement Agreement, and to bind their principals to the terms of this Settlement Agreement.

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of this _____ day of October, 2007.

DOVER LIMITED

By: _____
        Wendy Sui Cheng Yap

A.B. WATLEY, INC.

By: _____
        Robert Malin

A.B. WATLEY GROUP, INC.

By: _____
        Steven Malin

A.B. WATLEY DIRECT, INC.

By: _____
        Ralph Armenti

| Deleted: Steven |
| --- |

| Deleted: |
| --- |

| Deleted: Steven Malin |
| --- |

| Deleted: {00059417.DOC } |
| --- |

{00059417.DOC 1}12

Exhibit C

LAW OFFICES OF
THOMAS M. MULLANEY
708 THIRD AVENUE, SUITE 2500
NEW YORK, NEW YORK 10017
Tel.: (212) 223-0800
Fax: (212) 661-9860

February 1, 2008

**BY FACSIMILE**

Hon. Frank Maas
United States Magistrate Judge
United States Courthouse
500 Pearl Street, Room 740
New York, NY 10007-1312

Re: _Dover Limited, et al. v. A.B. Watley Group, Inc and A.B. Watley, Inc._
    07-Civ-11215 (DLC)(FM)

Dear Magistrate Maas:

    I write pursuant to Local Rule 37.2 seeking a pre-motion conference prior to Judgment
Creditor's motion to compel responses to subpoenas _duces tecum_ served on the Judgment
Debtors, as well as A.B. Watley Direct, Inc. ("Direct") (together, "the Watley Entities") and Janis
Johnson, and for the testimony of corporate representatives of the Watley entities. This case was
referred to Your Honor on January 10, 2008.

    First, without application to the Court or agreement of counsel, the Watley entities have
refused to appear for Rule 30(b)(6) depositions without explanation. Their conduct is in
contempt of Court, and their attendance at deposition ought to be compelled to occur forthwith.

    Second, the Watley entities have propounded improper objections to the document
requests served upon them, as has Ms. Johnson. The judgment debtors have agreed to produce
only those documents created after the date judgment was entered in this action, and which
reflect conditions on or after such date. Any judgment creditor is entitled to discover information
concerning the assets of a judgment debtor, period. Judgment debtors' counsel candidly admitted
that he had not researched the question of whether that objection had a good faith basis, instead
stating that it just "seemed reasonable" to him. That objection is unreasonable, however, because
judgment debtors are unlikely to create documents identifying their assets after judgment is
entered. In fact, that objection would forbid a judgment creditor from discovering the current
assets of a judgment debtor. The Judgment Debtors' refusal to produce responsive documents

1

that pre-date December 13, 2008 or reflect conditions before that date lacks a good faith basis in fact or law.

Direct has objected to certain document requests on the faulty basis that because it is not a judgment debtor, inquiries into its assets are not allowed. The fact is that Direct itself is an asset of Group, so Direct's assets are those of Group. One of the two pages of documents that Group did produce show that Direct is a subsidiary of Group, in addition to a company identified only as LLC, and an entity called "AB Watley Futures Corp."

Direct also failed to produce documents responsive to requests seeking information concerning payments it may have made or be making for the benefit of the judgment debtors' or its officers, directors or employees on the grounds of relevance. Relevance is typically not a proper reason to withhold information at the discovery stage, and it would seem relevant if the managers of Direct are cabining funds in that entity, and conducting business that the parent used to conduct, in order to evade the judgment against the parent. As an asset of Group, Direct's finances are relevant to discovery of Group's assets.

Ms. Johnson has likewise refused to produce documents concerning Direct, although she offers no reason for her refusal. She also limits what are responsive documents concerning the judgment debtors by the date of entry of judgment against them, December 13, 2007. The allowable time of inquiry, however, pre-dates the entry of judgment. Otherwise, the law would actually encourage the fraudulent conduct of the judgment debtors in using the time before entry of judgment to convey their assets elsewhere. But such disdain for paying judgments and the discovery process is not what the law promotes.

Respectfully Submitted,

Thomas M. Mullaney

Cc:    Donald G. Davis, Esq.
       Ellenoff Grossman & Schole LLP
       370 Lexington Avenue
       New York, NY 10017
       By electronic mail

2

Exhibit D

LAW OFFICES OF
THOMAS M. MULLANEY
708 THIRD AVENUE, SUITE 2500
NEW YORK, NEW YORK 10017
Tel.: (212) 223-0800
Fax: (212) 661-9860

March 3, 2008

**BY FACSIMILE**

Hon. Frank Maas
United States Magistrate Judge
United States Courthouse
500 Pearl Street, Room 740
New York, NY 10007-1312

Re: *Dover Limited, et al. v. A.B. Watley Group, Inc and A.B. Watley, Inc.*
    07-Civ-11215 (DLC)(FM)

Dear Magistrate Maas:

I write pursuant to Local Rule 37.2 seeking a pre-motion conference prior to Judgment Creditor's motion to compel responses to subpoenas *duces tecum* served on Ellenoff Grossman & Schole LLP ("EGS").

First, without application to the Court or agreement of counsel, EGS refused to appear for a deposition contrary to a subpoena *duces tecum* served on it on February 1, 2008. EGS' refusal to appear is in contempt of Court, and its attendance at deposition by the personal most knowledgeable of the noticed topics ought to be compelled to occur forthwith.

Second, EGS has asserted improper objections to the document requests served upon it, and produced no documents at all, nor did it produce a privilege log. EGS has expressly asserted a blanket attorney-client privilege as to all of Dover's inquiries in furtherance of judgment collection efforts, and has not articulated what documents and communications are protected by all of the elements of the privilege. It was required to identify what documents are actually privileged, and identify those documents that contain allegedly privileged material, by applicable rules. It has not, and instead threatened Dover's counsel with an application for sanctions should he move to compel the production of non-privileged, responsive documents.

The case law on this subject is well-settled. The party claiming the privilege has the burden of establishing its essential elements. *United States v. Construction Prods. Research*, 73

1

F.3d 464, 473 (2d Cir. 1996).  The assertion of the protection afforded by the attorney-client or work product "cannot be met by mere conclusory or ipse dixit assertions in unsworn motion papers authored by attorneys." *E.g., OneBeacon Ins. Co. v. Forman Intern., Ltd.* 2006 WL 3771010, *4 (S.D.N.Y. 2006)(RWS)(party seeking protection has burden to establish privilege). Contrary to EGS' position, "a party cannot conceal a fact merely by revealing it to his lawyer." *Id.* at *5.  For example, "A communication concerning the fee to be paid has no direct relevance to the legal advice to be given...[and] is not privileged." *Priest v. Hennessey*, 51 N.Y.2d 62, 431 N.Y.S.2d 511 (N.Y. 1980)

Moreover, by failing to produce a privilege log on the return date for the subpoena, EGS has waived its claims of privilege. *Id.* at *8.  The *OneBeacon* Court follows a long line of cases in this District finding a waiver in such circumstances. *E.g., FG Hemisphere Assoc., L.L.C. v. Republique du Congo*, 2005 WL 545218 (S.D.N.Y. 2005)(SAS)(HBP)(citing cases on point).  As Magistrate Judge Pitman wrote, "As other judges in this District and I have repeatedly held, the unjustified failure to list privileged documents on the required log of withheld documents in a timely and proper manner operates as a waiver of any applicable privilege." *Id.*  FRCP Rule 26(b)(5) and Local Rule 26.2 require that specific information be provided that enables another party to assess the applicability of the privilege. *OneBeacon Ins. Co., at *6.*  An attorney's blanket statement that all documents responsive to a subpoena are privileged is entirely insufficient to prove the essential elements of the privilege. *Id.* at *7, *citing In re Application for Subpoena to Kroll*, 224 F.R.D. 326, 328-29 (E.D.N.Y. 2004).

Because a blanket assertion of the attorney-client privilege, made without benefit of a privilege log, is all that EGS has done here, this Court should compel it to produce all responsive documents and appear for deposition forthwith, and find that it has waived the attorney-client and or work-product privileges by its failure to produce a log as required by FRCP Rule 26.

Finally, Judgment Creditor Dover has a similar letter motion pending before this Court, dated February 1, 2008, concerning the improper withholding of documents by the Judgment Debtors, as well as A.B. Watley, Direct, Inc.  As it once appeared that Judge Cote might rule on that application, Dover would be pleased to resubmit this letter to Your Honor.

Respectfully Submitted,

Thomas M. Mullaney

Cc:    Donald G. Davis, Esq.

2

Ellenoff Grossman & Schole LLP
370 Lexington Avenue
New York, NY 10017
By electronic mail

Exhibit E



370 Lexington Avenue
New York, NY 10017
Telephone: (212) 370-1300
Facsimile: (212) 370-7889
www.egsllp.com

Donald G. Davis
E-mail: ddavis@egsllp.com

March 6, 2008

**_By Facsimile_**

Hon. Frank Maas
United States Magistrate Judge
United States Courthouse
500 Pearl Street, Room 740
New York, New York 10007

Re: <u>Dover Limited et. al. v. A.B. Watley Group, Inc. and A.B. Watley, Inc.,
07 Civ. 112156 (DLC) (FM)</u>

Dear Judge Maas:

We are counsel for A.B. Watley Group, Inc. ("Group") and A.B. Watley, Inc.
("Inc.") (collectively, the "Watley defendants") in the above-captioned action, and also
represent various non-parties who have been served with discovery in this action, including
A.B. Watley Direct, Inc. ("Direct"), as well as some of the employees/consultants of the
foregoing entities.

We write in response to the letter of March 3, 2008 from Thomas M. Mullaney,
Esq., counsel for plaintiff Dover Limited, and also address the issues raised by Mr.
Mullaney in his earlier letter of February 1, 2008.

<u>Plaintiff's March 3rd Letter</u>

To put it quite bluntly, Mr. Mullaney's discovery requests served upon this law firm
are not only unnecessary and unduly burdensome, but abusive, particularly since this is
merely a supplemental action for the enforcement of a judgment against the Watley
defendants.

First, we did not ignore such requests, but instead served formal responses and
objections to the discovery requests from plaintiff in this action.

Moreover, to the extent that plaintiff sought information that was directly relevant
and germane to the judgment enforcement proceedings, we did in fact respond, stating

{00069165.DOC.1}

Ellenoff Grossman & Schole LLP

that our firm "is not holding any funds in escrow, or otherwise in the name of, or for the benefit of [the judgment debtors] Inc. or Group." (Document Request No. 2).

However, the other requests were so burdensome and beyond any reasonable scope of discovery as to make them palpably improper. More importantly, they also strike at the very heart of and directly trample upon the attorney-client privilege between the Watley entities and our firm, since it is indisputable that any information or knowledge that we might have that is conceivably relevant or related to this judgment enforcement proceeding was learned in the course of our representation of the Watley entities, and is therefore clearly privileged. We have made these objections to Mr. Mullaney, both formally and in informal attempts to resolve this matter, but he has refused to acknowledge the legitimacy of the attorney-client privilege in this context.

Moreover, to assert, as Mr. Mullaney does, that we should be put to the oppressive burden of producing a privilege log for what would be thousands of communications between our firm and our clients is nothing short of absurd -- particularly in view of the presumptive privilege that applies to our direct communications with our clients. This is especially true in light of the rather expansive "Time Period" used by Mr. Mullaney in his document requests -- which have absolutely no relationship to the date of the judgment -- but instead is defined as "the first date which YOU [our firm] *began representing* A.B. Watley, Inc. or A .B. Watley Group, Inc., *for any purpose*, to present."

Mr. Mullaney has also improperly ignored the attorney-client privilege by asking for copies of "Any [sic] all communications [between our firm and] Janice Johnson" (Document Request No. 8), a consultant to the Watley entities who has worked closely with such companies in all matters regarding the Dover/Watley dispute, and has acted as an agent of the Watley entities in coordinating litigation strategy with our firm. Ms. Johnson herself is an attorney.

Consequently, we have fully complied with our obligations, which thus obviates the need for a protective order, since FRCP 45(d)(2) speaks of asserting privileged claims without the necessity of moving for a protective order.

Apart from issues of privilege, the document requests are also improper in that they are both overbroad, having no relationship to the limited scope of a judgment enforcement proceeding, and also seek voluminous information about entities that are not even a judgment debtor in this case, such as A.B. Watley Direct, Inc. (See, e.g., Document Request No. 4: "All documents reflecting the ownership and/or corporate governance structure of A.B. Watley Direct, Inc.").

As set forth below, in our response to Mr. Mullaney's letter of February 1, 2008, Direct was given a General Release by plaintiff in the very Settlement Agreement that contained the Judgment that plaintiff is herein seeking to enforce. Indeed, it appears that

Ellenoff Grossman & Schole LLP

Mr. Mullaney's attempt to obtain discovery from our firm is predicated primarily upon the same fatally flawed premise that Dover can explore issues of "alter ego" and "piercing the corporate veil," in order to get at Direct's assets, when Direct, as noted, has been released from any such potential liability.

As to the subpoena served upon our firm for a deposition, we respectfully requested Mr. Mullaney to withdraw it, based on the obvious problems created by the attorney-client privilege, particularly since we had already represented to him that we were not holding any monies in escrow for the judgment debtors, or any other property belonging to the judgment debtors. Again, even beyond the privilege issues, it is hard to fathom a good-faith basis for Mr. Mullaney's insistence on taking our firm's deposition.

In short, Mr. Mullaney has acted like a "bull in a china shop," in respect of his abusive and oppressive tactics toward our law firm, in addition to his improper actions toward other parties, as set forth below.

Plaintiff's February 1st Letter

This letter, which we did not previously respond to, pending confirmation of the referral of this matter to Your Honor, concerns discovery requests directed to the judgment debtors or non-parties other than our firm

First, contrary to Mr. Mullaney's suggestion, there has never been a "refusal" to appear by any of the subpoenaed parties or witnesses. In fact, the deposition of Janice Johnson has already been conducted, we have agreed upon a date for Steven Malin, and we are endeavoring to schedule specific dates for other parties and non-parties as well.

Secondly, in response to the document requests served by plaintiff, the Watley defendants produced copies of the balance sheets for both A.B. Watley, Inc. and A.B. Watley Group, Inc. -- for *the three-month period ending December 31, 2007* -- effectively giving plaintiff full financial information dating from the period well before the judgment on December 13, 2007, and even dating before the underlying settlement agreement that formed the basis for the judgment.

Plaintiff's document requests, in contrast, are unduly burdensome and unreasonable, seeking virtually all documents dating back to the inception of the underlying action, to June 2003, approximately four and one-half years ago. Such a request constitutes pure harassment, and would furthermore serve no purpose: Of what possible relevance to a judgment creditor is information concerning assets well before the judgment, since the entire purpose of supplemental proceedings is to identify assets to levy upon? In any event, plaintiff has been provided with relevant information that precedes the date of the judgment by virtually ninety (90) days.

Ellenoff Grossman & Schole LLP

Most significantly, Mr. Mullaney has greatly over-reached with respect to the discovery served on *Direct*. Although Direct is not a judgment debtor, having received a General Release from plaintiff, Mr. Mullaney has continued to improperly pursue its assets. Indeed, as this Court is well aware, this is not the first time that plaintiff has wrongly tried to "pierce the corporate veil," in blatant defiance and disregard of the release given to Direct, having served, in November of 2007, restraining notices on Direct's bank (HSBC) and clearing broker (Penson), which caused interruption to Direct's business.

That incident led to a court conference and motion practice in November, in which this Court, by Decision and Order dated December 11, 2007, held that it lacked jurisdiction over judgment enforcement proceedings at such time, but nevertheless found that the "financial obligation [under the Settlement Agreement] did not extend to Direct, which was expressly released from any further liability to the Plaintiff." (Decision, at 3)

However, this did not deter Mr. Mullaney from continuing to serve improper discovery and restraining notices. Plaintiff, in a subsequent round of restraining notices, again stepped over the line by including in a restraining notice a bank account number that belonged to Direct, and which also caused the bank to freeze Direct's account. I had to locate Mr. Mullaney in Singapore before I was able to get this improper restraint lifted.

It is clear that plaintiff's current attempt to "go after" Direct on an "alter ego" or piercing the corporate veil theory is improper. As recently reaffirmed by a federal appeals court, *Kreisler v. Goldberg, 478 F.3d 209, 213 (4th Cir. 2007)*, "[i]t is a fundamental precept of corporate law that each corporation is a separate legal entity with its own debts and assets, even when such corporation is wholly owned by another corporate entity." Consequently, the *Kreisler* Court held that because the parent and subsidiary were "distinct legal entit[ies], a judgment against [one] imposes no obligations or liability on [the other]."

Consequently, due to the fact that plaintiff gave Direct a General Release -- on top of the fact that the underlying action contained veil piercing allegations against Direct and was dismissed with prejudice -- it is beyond dispute that plaintiff is now barred from seeking to reach Direct's assets under an alter ego or veil-piercing theory, or on any other basis for that matter.

Respectfully submitted,

Donald G. Davis

Exhibit F

**EGS**

Ellenoff Grossman & Schole LLP

Donald G. Davis
E-mail: ddavis@egsllp.com

**MEMO ENDORSED**

370 Lexington Avenue
New York, NY 10017
Telephone: (212) 370-1300
Facsimile: (212) 370-7889
www.egsllp.com

USDC SDNY
DOCUMENT DEC 26 2006
ELECTRONICALLY FILED
DOC #
DATE FILED: 1/3/07

December 22, 2006

*I denied a motion to dismiss the Third Amended Complaint by Memorandum Decision dated 10/18/06. I do not intend to entertain successive Rule 12(b)(6) motions addressed to the same pleading. Accordingly, the request to file such a motion is denied.*

**By Hand**

Hon. Frank Maas
United States Magistrate Judge
United States Courthouse
500 Pearl Street, Room 740
New York, New York 10007

Re: Dover Limited et. al. v. A.B. Watley Group, Inc. et al., 04 Civ. 7366 (RMB) (FM) *In reviewing the docket sheet, I note that none of the defendants have answered the Third Amended Complaint. It also am mystified as to why Mr. Mullaney doesn't complain about that in his 12/29/06 letter.*

Dear Judge Maas:

We are counsel to defendants A.B. Watley Inc. ("ABW"), A.B. Watley Group, Inc. ("Group"), and A.B. Watley Direct, Inc. ("Direct") (collectively, the "Watley defendants") in the above-referenced action. *Depositions are scheduled to begin in January. Issue certainly should be joined before then. The defendants therefore are directed to serve*

We submit this letter in order to bring to the Court's attention what we believe are *and file their answers to the Third Amended* various claims asserted by plaintiffs in the Third Amended Complaint ("TAC") that are in *Complaint by January 17,* violation of the Court's prior rulings, contained in its Order of June 6, 2006 (the "June 2007.

Order"), which constitute the "law of the case." As a consequence thereof, we respectfully *Maas, USMJ, 12/29/06* submit that there are no valid claims asserted against Group and Direct, and that they should therefore be dismissed from this action.

More specifically, in this Court's June Order, Your Honor expressly ruled that plaintiffs would be allowed to add only two potential causes of action regarding the Watley defendants, if they met certain pleading requirements: (a) adding Group and Direct to the "conversion claim," and (b) "promissory estoppel/unjust enrichment" against all of the Watley defendants, in accordance with the principles previously set forth by this Court in

*MEMO ENDORSED*

Ellenoff Grossman & Schole LLP

*Eschelbach v. CCF Charterhouse/Credit Commercial de France, 2006 WL 27094*

*(S.D.N.Y. Jan. 4, 2006) ("Eschelbach").*

As to the "conversion claim," in this Court's most recent decision of October 18,

2006 ("October Decision"), which dealt with motions not related to the issues raised herein,

this Court noted that "[n]otwithstanding [plaintiffs'] contention that Group and Direct were

alter egos of ABW, the Plaintiffs have *not* named these entities in Count II of the TAC,

which charges ABW with the conversion of their funds." (October Decision, at 8, n.3

(emphasis added)).

As to the "unjust enrichment" claim, which is contained in the "Seventh Cause of

Action" of the TAC, plaintiffs fail to allege any facts that overcome the clear standard

articulated by this Court in *Eschelbach* that such a claim is unavailable "when an express

contract covers the relationship between the parties." 2006 WL 27094 at *9.

Indeed, in its June Order (at 1-2), this Court held that plaintiffs:

> have not shown that the liability, if any, of the other Watley
> defendants is not covered by an express contract. Accordingly,
> plaintiffs may add a claim for promissory estoppel/unjust enrichment
> against all of the Watley defendants only if they are able to allege
> additional facts supporting these claims. [Citing *Eschelbach*]

It is evident that plaintiffs have failed to allege any facts to support their cryptic and

conclusory unjust enrichment claim. Paragraph 133 of the TAC alleges merely that

"Defendant Watley was enriched by Plaintiffs' remittance of funds." Similarly, Paragraph

134 alleges that "Defendant Watley's enrichment has been at Plaintiffs' expense." There is

not a single allegation to suggest that the purported claim arises out of anything other than

the express customer agreement between plaintiffs and ABW (which plaintiffs refer to as

Ellenoff Grossman & Schole LLP

"Watley" in the TAC). Moreover, as with their conversion claim, plaintiffs do not even name Group or Direct in this count.

Consequently, based on this Court's prior rulings, which constitute the law of the case, the TAC has failed to assert any viable claims against Group or Direct.

Moreover, in direct contravention of this Court's June Order, which restricted plaintiffs' potential amendments to repleading the conversion and unjust enrichment claims, as discussed above, plaintiffs have asserted numerous additional causes of action, many of which had already been dismissed by this Court in its initial decision in this action, dated March 27, 2006 ("March Decision"): "Breach of the Agreement" (Third Cause of Action), "Breach of the Implied Covenant of Good Faith and Fair Dealing" (Fourth Cause of Action), "Breach of Fiduciary Duty" (Fifth Cause of Action), "Negligence (In the Alternative)" (Also Denominated as the "Fifth Cause of Action"), and "Negligent Supervision (In the Alternative) ("Sixth Cause of Action").

Consequently, all of these counts are in violation of the Court's ruling in its June Order. Indeed, in the Court's October Decision, in ruling on various motions by defendant Alain Assemi, Your Honor expressly noted that "prior rulings" made on the same issues "constitute the 'law of the case' and thus are not subject to further review at this stage." (Citing *In re PCH Assocs.*, 949 F.2d 585, 592 (2d Cir. 1991)). In the same vein, the Third through Sixth "Causes of Action" noted above (including both counts designated as "Fifth Cause of Action") also defy the "prior rulings" made in this action which constitute the "law of this case."

Finally, the very reason why plaintiffs were not given leave to replead these particular counts is because they were not capable of being adequately repled -- as

3

Ellenoff Grossman & Schole LLP

Plaintiffs' Fifth Cause of Action for "Breach of Fiduciary Duty" is also deficient on its face. As recently stated by this Court *in Langenberg v. Sofair, No. 03 Civ. 8339(KMK)(FM), 2006 WL 3518197 (S.D.N.Y. Dec. 07, 2006)*:

> New York courts have concluded that securities brokers who simply execute trades owe no fiduciary duty to their clients. *See, e.g., Ascot Fund Ltd. v. UBS PaineWebber, Inc.,* 814 N.Y.S.2d 36 (1st Dep't 2006) (affirming dismissal of fiduciary duty claim where defendant did not provide any investment advice or have discretionary trading authority); *Fesseha v. TD Waterhouse Inv. Servs., Inc.,* 761 N.Y.S.2d 22, 24 (1st Dep't 2003) ("The claim for breach of fiduciary duty was properly dismissed since plaintiff opened a non-discretionary account, and the relationship between plaintiff and defendant was merely that of broker and customer").

Neither the Customer Agreement nor any allegations in the TAC suggest that ABW itself -- as opposed to Assemi through any of his purported and unauthorized representations -- had anything other than a broker-customer relationship with plaintiffs, or that there was any investment advice or discretionary trading authority exercised by ABW on plaintiffs' behalf.

Finally, plaintiffs' restated claims for "Negligence" (also denominated as the "Fifth Cause of Action") and "Negligent Supervision" ("Sixth Cause of Action") are also baseless. First, this Court ruled in its June Order that "there is no basis for a negligent supervision claim."

Secondly, although plaintiffs have tried to circumvent this ruling by substituting John Amore for Alain Assemi as the allegedly "unsupervised employee," the allegations made by plaintiffs are entirely conclusory and therefore inadequate as a matter of law. In short, all that plaintiffs do in the TAC is to mechanically incorporate the hornbook elements of a negligent supervision claim as set forth in *Ehrens v. Lutheran Church, 385 F. 2d 232, 235 (2d Cir. 2004)*, by alleging, for example, that ABW "knew or should have

Ellenoff Grossman & Schole LLP

known of Amore's propensity for misappropriating client funds." (TAC ¶ 128)  However,

as set forth in *Ross v. Mitsui Fudosan, Inc., 2 F.Supp.2d 522, 532-33(S.D.N.Y.1998):*

> To survive a motion to dismiss a claim of negligent supervision, a
> plaintiff must plead facts that show that the employer knew of the
> employee's propensity for the type of behavior that caused plaintiff's harm.
> *See Kirkman*, 204 A.D.2d at 403, 611 N.Y.S.2d at 616; *see also Haybeck v.
> Prodigy Serv. Co.*, 944 F.Supp. 326, 332 (S.D.N.Y.1996), *appeal dismissed*,
> 116 F.3d 465, 1997 WL 338844 (2d Cir.1997). *Conclusory allegations of
> negligent supervision are insufficient to overcome a motion to dismiss. See
> Richardson v. New York Univ.*, 202 A.D.2d 295, 296, 609 N.Y.S.2d 180,
> 182 (1st Dep't 1994). [Emphasis added]

*Accord, Daniels v. Loizzo,* 174 F.R.D. 295, 299 (S.D.N.Y. 1997) ("Given the

absence of factual allegations addressing the 'knowledge' element of the negligent hiring,

retention and supervision claims, it is clear that the proposed amendment could not

withstand a motion to dismiss under Rule 12(b)(6)); Manno v. Mione  249 A.D.2d 372,

373, 670 N.Y.S.2d 368, 369 (2d Dept. 1998) (court dismissed cause of action for negligent

supervision that contained "little more than bare legal conclusions").

Moreover, Group and Direct are also not in fact named in these negligence or

negligent supervision claims (or indeed, in any specific counts of the Counts of the TAC).

For the above-referenced reasons, defendants Group and Direct respectfully seek

leave to move to dismiss all of the claims asserted against them in the TAC, and defendant

ABW similarly seeks the dismissal of all claims asserted against it except for the

conversion claim.

Respectfully submitted,

Donald G. Davis

cc:    Thomas M. Mullaney, Esq. – via email and regular mail
       Mr. Alain Assemi – via email and regular mail

Exhibit G

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------- --X

DOVER LIMITED,

       Plaintiff,

     -against-

A.B. WATLEY, INC., A.B. WATLEY GROUP,
INC., A.B. WATLEY DIRECT, INC.

       Defendants.

--------------------------------------------------X

A.B. WATLEY, INC., A.B. WATLEY GROUP,
INC., and A.B. WATLEY DIRECT, INC.,

      Third-Party Plaintiffs,

     -against-

JOHN J. AMORE,

      Third-Party Defendant.

--------------------------------------------------X

Case No. 04 CV 7366 (FM)

**STIPULATION AND ORDER
OF DISCONTINUANCE
WITH PREJUDICE**

## ORIGINAL

    **IT IS HEREBY STIPULATED AND AGREED**, by and between the undersigned, the

attorney for Plaintiff Dover Limited and the attorneys for defendants A.B. Watley, Inc., A.B.

Watley Group, Inc., and A.B. Watley Direct, Inc., in the above-entitled action, that, whereas no

party hereto is an infant or incompetent person for whom a committee has been appointed, and

no person not a party herein has an interest in the subject matter of this action, that all of

Plaintiff's claims against defendants A.B. Watley, Inc., A.B. Watley Group, Inc., and A.B.

Watley Direct, Inc. be, and the same hereby are, dismissed with prejudice and without costs,

disbursements and/or attorneys' fees to either party as against the other. This Stipulation may be

filed without further notice with the Clerk of the Court.

Dated: New York, New York
        October 8, 2007

ELLENOFF GROSSMAN & SCHOLE                LAW OFFICES OF THOMAS M. MULLANEY

By:                                        By:
    Donald G. Davis, Esq. (3282)                Thomas M. Mullaney (TM 4274)

370 Lexington Ave.                          708 Third Avenue, Suite 2500
New York, New York 10017                    New York, New York 10017
(212) 370-1300                              (212) 223-0800
Attorneys for Defendants                    Attorneys for Plaintiffs
A.B. Watley, Inc., A.B. Watley Group,       Dover Ltd. and Wendy Sui Cheng Yap
Inc., and A.B. Watley Direct, Inc.

SO ORDERED:

The Hon. Frank Maas, U.S.M.J.    10/9/07

-2-

Exhibit H

Page 1

1

2            IN THE UNITED STATES DISTRICT COURT

3            FOR THE SOUTHERN DISTRICT OF NEW YORK

4

5   DOVER LIMITED,                 ) No. 07 CV 11215
                                   ) (UA)
6      Judgement Creditor,         )
                                   )
7            vs.                   )
                                   )
8   A.B. WATLEY, Inc. and          )
    A.B. WATLEY GROUP,             )
9   INC.,                          )
                                   )
10     Judgement Debtors.          )
    ----------------------------)

11

12

13

14            DEPOSITION OF JANICE JOHNSON

15               New York, New York

16          Thursday, February 21, 2008

17

18

19

20

21

22

23  Reported by:

24  PENNY SHERMAN

25  JOB NO. 201032

Janice Johnson

Page 6

```
1                Johnson
2  break.
3        (A recess was taken.)
4   Q.   If you need to take another break or you
5  need more water, please let me know.  I'll be happy
6  to accommodate.  If you need to use the ladies'
7  room, Mr. Davis, if you need to use the men's room,
8  we'll take a break and I'll give you the key for
9  that.
10       Have you ever been deposed before?
11  A.   I have.
12  Q.   How many times?
13  A.   Once.
14  Q.   May I ask generally the circumstances --
15  A.   I'm the president of my co-op and we had
16  somebody suing us.
17  Q.   Say no more.  Well, you're probably
18  generally familiar with the rules, then, so I
19  won't -- I won't belabor them.
20       Are you on any medication today that
21  would affect your memory or your ability to answer?
22  A.   No.
23  Q.   Where do you work?
24  A.   I am self-employed.  I consult at A.B.
25  Watley Group.  I consult to an accounting firm here
```

Page 7

```
1                Johnson
2  in the city on hedge-fund issues.  I chair a
3  for-profit worker's comp. insurance board, and I do
4  a couple of other minor consulting things.
5   Q.   What's the name of your consulting
6  company?
7   A.   Janice M. Johnson Consulting.
8   Q.   One of the rules is probably today,
9  speak slowly enough for the court reporter to
10 capture everything.  I tend to mumble a little bit,
11 so correct me if I do that.  And wait for me to
12 finish my question before you answer so the court
13 reporter can capture it.
14       Is Janice M. Johnson Consulting a
15 corporation, S corporation?
16  A.   No.
17  Q.   LLP?
18  A.   No.  Sole proprietorship.
19  Q.   Where is it officed?
20  A.   In my home.
21  Q.   Where is your home?
22  A.   301 East 52nd Street.
23  Q.   Does Janice M. Johnson Consulting
24 consult for any of the Watley entities?
25  A.   Yes, it consults for all of them.
```

Page 8

```
1                Johnson
2   Q.   It consults for A.B. Watley, Inc.?
3   A.   Not really.  There's no activity.
4  Occasionally there's an issue about a judgement or
5  somebody suing them.  Very little compared to the
6  other stuff.
7   Q.   And it consults with A.B. Watley Direct?
8   A.   Yes.
9   Q.   Do you mind if I call Janice M. Johnson
10 Consulting you?
11  A.   Yes.
12  Q.   You do mind?
13  A.   No.  That's fine.
14       MR. DAVIS:  Without -- just for the
15 record, that we're not, you know, conceding
16 any legal consequences for that, but just for
17 convenience, you can refer to them in that
18 fashion.
19       MR. MULLANEY:  That's fine.
20  Q.   Do you have a consulting contract with
21 A.B. Watley Group?
22  A.   No, it's all oral.
23  Q.   And I take that you have an oral
24 contract with A.B. Watley Direct?
25  A.   No.  It's with Group.
```

Page 9

```
1                Johnson
2   Q.   So you have no contract with Direct?
3   A.   No.
4   Q.   You have a contract with Inc.?
5   A.   No.
6       MR. MULLANEY:  For the record, we'll
7  call A.B. Watley, Inc., Inc.; A.B. Watley
8  Group, Group; and A.B. Watley Direct, Direct,
9  if that's okay with everybody.
10      THE WITNESS:  That's fine.
11  Q.   What are the terms of your consulting
12 arrangement with A.B. Watley Group?
13      MR. DAVIS:  Objection to form.
14      You can answer.  I'm just objecting to
15 the form of the question just to preserve the
16 record as far as assuming there are specific
17 terms in light of the description of it as an
18 oral situation.  But to the extent there are
19 certain conditions or understandings, you are
20 free to testify about that.
21  A.   My general duties are, I try to manage
22 the operational issues of the company, how people
23 get paid, the facts -- managing the legal
24 relationships, the accounting relationships,
25 negotiating the leases, all the things that sort of
```

3 (Pages 6 to 9)

Janice Johnson

Page 10

Johnson

1
2 keep the company a company.
3    Q.    And this is for A.B. Watley Group?
4    A.    Well, I'm employed by Group. Some of
5 these, like the lease, is in Direct's name. The
6 accountants, there's an audit of the broker-dealer.
7 There is also --
8    Q.    The broker-dealer is Direct?
9    A.    Direct. And there is also a pending
10 audit of Group, the public company, which has not
11 taken place since 2005. So there are discussions
12 that go on about how can we get it current in its
13 filings, things like that.
14        MR. DAVIS: Let me interrupt. Just to
15    clarify the record, when you said that you
16    were employed by Group, you didn't mean that
17    in a technical employment sense.
18        THE WITNESS: No, I didn't. Did I say
19    that?
20        MR. DAVIS: I believe you used that
21    terminology.
22    A.    Okay. I'm -- I report to Group and I
23 report to Steven Malin, who's the chair of Group,
24 M-A-L-I-N.
25    Q.    Does Group currently have any

Page 11

Johnson

1
2 operations?
3    A.    No.
4    Q.    When did it cease operations?
5    A.    Well, define operations, first.
6    Q.    Well, we'll go back.
7        I believe your testimony was, you try to
8 manage the operations of Group; is that correct?
9    A.    By operations, I mean the judgments that
10 are still out there that we try to pay that its
11 relationships with Direct --
12    Q.    Uh-huh.
13    A.    -- its relationships with Inc. to the
14 extent there are any, but Inc. is pretty -- has
15 been pretty quiet since I've started working with
16 them. Again, things like getting the
17 public-company audit done at some point.
18    Q.    Uh-huh.
19    A.    Things like transitioning the last lease
20 was with Group, this current lease is with Direct,
21 because it made no sense that it was at the Group
22 level, since Group is not the operating company --
23    Q.    Uh-huh.
24    A.    Things like that.
25    Q.    Did Group ever have any -- let me go

Page 12

Johnson

1
2 back.
3        When did you start consulting for the
4 Watley entities?
5        MR. DAVIS: Again, if you could -- if
6    there's any distinction among the various
7    entities, you can make that distinction if so.
8    A.    The relationship has been the same the
9 whole time. It was about the beginning of 2006.
10    Q.    Did Group have any, what you would term
11 operations in the beginning of 2006?
12    A.    No.
13    Q.    Is Group the parent company of A.B.
14 Watley Direct?
15    A.    Yes.
16    Q.    A.B. Watley Direct is a wholly owned
17 subsidiary of Group?
18    A.    Yes.
19    Q.    Is there a document, to your knowledge,
20 that memorializes the ownership of Direct by Group?
21    A.    I believe there is. I'm not totally
22 certain I've seen it.
23    Q.    What makes you believe there is?
24    A.    Well, I have seen a stock certificate.
25    Q.    Where have you seen a stock certificate?

Page 13

Johnson

1
2    A.    In the offices.
3    Q.    Of?
4    A.    Direct.
5    Q.    Does Group have offices anymore?
6    A.    No. Other than in Direct's offices.
7    Q.    When did Group stop having an office?
8    A.    To the best of my knowledge, it was
9 always in the same space as A.B. Watley, Inc.
10 first, and then Direct when Direct started
11 functioning as broker-dealer.
12    Q.    So Group never had offices; is that your
13 testimony?
14    A.    Not that I know of.
15    Q.    Okay. When was Group on the lease, as
16 you say, for the office space of the Watley
17 entities?
18    A.    I am not sure. I believe they're on a
19 lease at 90 Park --
20    Q.    Uh-huh.
21    A.    -- no, that's not even true. No, they
22 weren't on the lease at 90 Park. I believe 40 Wall
23 was the last time they were on the lease.
24    Q.    Does Group have any employees?
25    A.    No, other than me as a consultant,

4 (Pages 10 to 13)

## Janice Johnson

Page 14

1              Johnson
2 Robert Malin is, I guess, a consultant at the Group
3 level --
4     Q.    Uh-huh.
5     A.    And Pam Luteran divides her time between
6 Group and Direct.
7     Q.    What does Ms. Luteran do at Group if it
8 has no operations?
9     A.    Again, bookkeeping, as we try to pay
10 down debts and things like that, the accounting
11 functions.
12     Q.    How does Group accumulate any debts if
13 it has no business?
14     A.    It has its outstanding debts from prior.
15     Q.    What was its business?
16     A.    Its original business, as I understand
17 it, since I wasn't around when it had its original
18 business, was to develop the software that became
19 the platform that A.B. Watley used in its online
20 trading business. And it eventually sold the
21 software to Penson, P-E-N-S-O-N, Financial
22 Corporation, and it retained rights to use the
23 software.
24     Q.    Ms. Johnson, would it be part of your
25 consulting duties to review SEC filings made by

Page 15

1              Johnson
2 Group?
3     A.    There haven't been any since I have been
4 there.
5     Q.    How do you know that?
6     A.    Well, my understanding is, there has not
7 been any updating of the public filing since March
8 of '05.
9     Q.    Where did you get that understanding?
10     A.    From Robert Malin, from Pamela Luteran,
11 from Steven Malin.
12     Q.    Would you be surprised to learn that one
13 was made in November of 2007?
14         MR. DAVIS:  Object to the form of the
15     question.
16         But if you know one way or the other,
17     you can answer.
18     A.    I guess, what are you referring to as an
19 SEC filing?
20     Q.    Something that Group sends to the SEC to
21 be made public generally on the EDGAR, E-D-G-A-R,
22 system.
23     A.    I guess I would be surprised.
24     Q.    Are you familiar with a company named FX
25 Solutions?

Page 16

1              Johnson
2     A.    Yeah, I am.
3     Q.    What is FX Solutions?
4     A.    It is a foreign-exchange trading
5 operation, as I understand it.
6     Q.    Where is FX Solutions?
7     A.    I don't know.
8     Q.    Why are you familiar with FX Solutions?
9     A.    Because, after the fact, I saw a press
10 release that had been drafted by Robert Malin and
11 sent out. And we tried to clean it up, but that's
12 all I'm aware of in terms of what went out there
13 with a press release on it.
14     Q.    What needed to be cleaned in the press
15 release sent out by Robert Malin?
16     A.    The press release seemed to indicate
17 that A.B. Watley Direct was in partnership with FX
18 Solutions and that it was something more than an
19 introducing broker to FX Solutions.
20     Q.    Didn't the press release, in fact, say
21 that A.B. Watley Group was in partnership with FX
22 Solutions?
23     A.    You could be right. I mean, I'm not
24 that clear on who it said was in partnership, but
25 nobody was in partnership.

Page 17

1              Johnson
2     Q.    Did --
3     A.    The actual agreement that I saw that
4 they entered into was with Direct.
5     Q.    FX Solutions entered into an agreement
6 with Direct; is that your testimony?
7     A.    That's what I understand, yes.
8     Q.    Is it pending?
9     A.    No. They canceled it.
10     Q.    When?
11     A.    Very shortly after that press release.
12     Q.    You're an attorney, correct, Ms.
13 Johnson?
14     A.    I am. I'm not licensed in New York.
15     Q.    Do you provide any legal advice to any
16 of the Watley entities?
17     A.    I review contracts and I review legal
18 relationships, and I decide when we need outside
19 counsel to actually provide legal advice.
20     Q.    That's the extent of the legal services
21 you provide to any of the Watley entities?
22         MR. DAVIS:  Objection to form.
23         You're characterizing them as legal
24     services.  She -- you can describe --
25     A.    Virtually anything is legal services.

5 (Pages 14 to 17)

Janice Johnson

Page 30

```
1            Johnson
2    A.   Yes, there is.
3    Q.   What was the monthly payment that's
4  supposed to be made?
5    A.   It was in the neighborhood of 10,500 a
6  month.  And as of March, it reduces to -- I think
7  it's about 9,800 per month.
8    Q.   What entity entered into the settlement
9  agreement with AT&T?
10   A.   Group, I believe.
11   Q.   How does Group make those monthly
12 payments?
13   A.   Again, it makes them to the extent
14 Direct has earnings that can make those payments.
15   Q.   And as a wholly owned subsidiary, Direct
16 transfers those earnings to Group?
17        MR. DAVIS:  I object to the form of the
18        question in terms of the predicate of the
19        characterization.  You can ask the facts, what
20        happens.
21   A.   I wouldn't characterize it quite that
22 way.  Direct just makes payments as it can related
23 to judgments that exist on Group, particularly this
24 one, since there's a lien against the Direct stock.
25   Q.   Well, what are the other payments that
```

Page 31

```
1            Johnson
2  Direct makes on behalf of Group?
3    A.   Again, a lot of the legal fees are at
4  the Group level.  A lot of the lawsuits that still
5  exist are against Group.  So to the extent Direct
6  can make payments of legal fees, it does.
7    Q.   Uh-huh.
8    A.   Is there anything else?  My payments,
9  they come out of Group.  If there's not enough
10 earnings after net capital and anything else, I
11 don't necessarily get paid, which has been a bit of
12 a pain and I'm behind in what's owed to me.
13   Q.   Your payments are made by Group?
14   A.   Yes.
15   Q.   All of -- you receive a check from A.B.
16 Watley Group?
17   A.   An ACH.
18   Q.   When's the last -- what's an ACH?
19   A.   Automated clearing-house payments.
20 They're the equivalent of a wire, but they don't
21 cost anything.  They take a day or two longer to
22 clear, but we've gone from wires to that to save
23 money.
24   Q.   Well, walk me through the mechanics, if
25 you know, of how the money goes from Direct to
```

Page 32

```
1            Johnson
2  Group to you.
3        MR. DAVIS:  Well, I think you're
4        assuming something that she hasn't necessarily
5        testified to.  She said -- well, I object to
6        the form of the question.
7             But you can answer as to how you get
8        paid.  I think you may --
9    A.   Payments are made on behalf of Group
10 when there is money.  When they are made on behalf
11 of Group, they come directly from Direct to whoever
12 is getting paid.
13   Q.   When was that arrangement made, that
14 Direct would make payments on behalf of Group?
15   A.   That has been going on as long as I've
16 been involved with Watley.
17   Q.   Did Group ever have a bank account that
18 had money in it?
19   A.   I do not know.  You know, it was before
20 my time.
21   Q.   Really?
22   A.   Yeah.
23   Q.   Okay.  Is there any reason why Group
24 keeps itself asset-free, shall we say?
25        MR. DAVIS:  Object to the form of the
```

Page 33

```
1            Johnson
2        question, the legal characterization.
3    A.   Well, again, all it has, other than the
4  two assets I told you, is a significant amount of
5  debt.  My understanding, there is an excess of $10
6  million in debt at the Group level.
7    Q.   Well, in your experience as a consultant
8  and as an attorney, is it common for a parent
9  company to take earnings that its subsidiary
10 generates?
11        MR. DAVIS:  Objection.  You can ask her
12        questions about what Direct does.  You're
13        asking her for a legal conclusion or a custom.
14        She's not here as an expert.  Again, you can
15        bring experts in.  You can make any legal
16        arguments you'd like, but Ms. Johnson is here
17        to tell you facts concerning this case.
18             So I think your question is wholly
19        improper and I don't think she's qualified to
20        answer it, frankly.
21        MR. MULLANEY:  Are you instructing the
22        witness not to answer?
23        MR. DAVIS:  No.  I won't instruct her
24        not to answer, but if you have a, you know --
25        he's asking you -- what are you asking about,
```

9 (Pages 30 to 33)

**Janice Johnson**

Page 34

```
1              Johnson
2  an industrywide custom?
3        MR. MULLANEY:  What I'd like, Mr. Davis,
4  is for you just to state your objection and
5  not feed the witness an answer that --
6        MR. DAVIS:  I'm not feeding her an
7  answer.
8        MR. MULLANEY:  You just did.
9     A.   Well, probably at my peril I'm going to
10 ignore counsel.  There's nothing that I can see
11 that's particularly normal about the structure of
12 A.B. Watley Group.  Normally, you would have a
13 separate subsidiary that would develop software.
14 You would not have all this debt in the parent
15 company.  It would not be structured this way at
16 all.
17       Normally, you would have a parent
18 company that was pretty clean and free of all this
19 crap.  And you would have a direct or any other
20 subsidiary that dividended up certain monies on
21 certain schedules.
22    Q.   Did you review the settlement agreement
23 between A.B. Watley Group, A.B. Watley Direct and
24 A.B. Watley, Inc. and Dover Limited before it was
25 executed?
```

Page 35

```
1              Johnson
2     A.   To a very limited extent.  I tried to
3  stay away from this discussion because I already
4  had discussions with you, and I wasn't sure that I
5  really believed the money could be raised.
6     Q.   Is that a yes or a no?
7     A.   Very limited.
8     Q.   Did you read it or not?
9     A.   I read it, yes.  I did read it.
10    Q.   And it was your view that A.B. Watley
11 Group could not raise the money that it had
12 promised to pay?
13    A.   I was worried, because I had not seen
14 this kind of capital raised in that quick a time,
15 ever.
16    Q.   And because Group had no assets with
17 which it could possibly pay, correct?
18    A.   Correct.
19    Q.   And no bank accounts?
20    A.   Correct.  But, as I understand it, the
21 discussions were that Kevin Baxter was going to
22 raise this money for Group, and he had committed to
23 that in the meetings with you and Steven Malin that
24 he said he was going to do this.  And he committed
25 to me he was going to do this.  And he committed to
```

Page 36

```
1              Johnson
2  me continually that this was going to happen.
3     Q.   In the settlement agreement with AT&T,
4  is it a requirement that the shares of Direct owned
5  by Group be maintained anywhere specific?
6     A.   Yes.
7     Q.   What does the agreement say?
8     A.   I believe Robert Malin is to have them
9  in a safe deposit box.
10    Q.   Do you know what bank that safe deposit
11 box is in?
12    A.   I don't know there is one, because there
13 was a problem opening it.  So I'm not sure there's
14 actually a safe deposit box that exists right now.
15 I know he took them off to the bank and they came
16 back to the office.
17    Q.   Was AT&T aware that the share
18 certificates are not where they were supposed to
19 be?
20    A.   I do not know.  I would doubt it.
21    Q.   But you are certain that those shares
22 are in the office, as you recall?
23    A.   To the best of my knowledge, yes.  The
24 last time I saw them, they were in the office.
25 Now, I haven't looked for them lately to see if
```

Page 37

```
1              Johnson
2  they're still there, but I assume they are.
3     Q.   Is there any other document that
4  memorializes the relationship between A.B. Watley
5  Group and A.B. Watley Direct?
6     A.   I assume the corporate documents do, but
7  I don't know.  I've never looked at them.
8     Q.   What corporate documents are those?
9     A.   Setting up Direct.
10    Q.   Have you ever seen those corporate
11 documents, as you say?
12    A.   I don't know.
13    Q.   Do you know where they would be, if
14 anywhere?
15    A.   There are various corporate books in the
16 file drawers.  I would assume they're there, but
17 that's -- I'm assuming it, because I haven't
18 specifically looked to see if those documents are
19 there.  I've had no need to.
20    Q.   If you can, could you describe to me the
21 decision-making process of when Direct elects to
22 make payments on behalf of its parent, to you, for
23 example?
24    A.   The decision-making process is that
25 Direct first and foremost pays all vendor bills
```

10 (Pages 34 to 37)

**Janice Johnson**

Page 38

```
 1              Johnson
 2 related to keeping the online broker in business.
 3    Q.   Uh-huh.
 4    A.   Included in that are the
 5 customer-service employees and related expenses to
 6 them.
 7    Q.   Uh-huh.
 8    A.   Second in line are any settlement
 9 payments that are memorialized that have to be
10 made.  AT&T, there are a number of fines related to
11 the NASD and Robert Malin and Linus Nwaigwe
12 L-I-N-U-S, N-W-A-I-G-W-E.  And so those fines are
13 being paid on a schedule to the regulators.
14    Q.   Uh-huh.
15    A.   Once those things are paid, then there's
16 a decision, is there money enough to pay me, to pay
17 Pamela Malin, to pay Robert Malin?
18    Q.   Do you know why Dover Limited is not
19 part of the settlement payment schedule?
20       MR. DAVIS:  I object to the form of the
21    question.  I think you're mischaracterizing,
22    you know, legally what's happened as far as
23    the settlement and the events that have
24    occurred.
25       MR. MULLANEY:  I don't think so.
```

Page 39

```
 1              Johnson
 2       MR. DAVIS:  I think you are.
 3    Q.   Can you answer the question, Ms.
 4 Johnson?
 5       MR. DAVIS:  I think -- well, Tom, you
 6    have rejected the deal that was in place
 7    because of the --
 8       MR. MULLANEY:  I'm going to stop you,
 9    Mr. Davis.  I'm not asking your testimony
10    today, although I will be asking your
11    testimony.  I'm asking Ms. Johnson.  I'm not
12    interested in you giving her answers to my
13    questions.  The question I asked was a yes or
14    no.
15       MR. DAVIS:  Yeah, but you're --
16       MR. MULLANEY:  If you're going to
17    instruct the witness not to answer --
18       MR. DAVIS:  I won't instruct her not to
19    answer because you're asking an unfair
20    question.  And you know the answer to this.
21       MR. MULLANEY:  No, I don't know the
22    answer to this.
23       MR. DAVIS:  You have rejected the notion
24    of settlement payments in the absence of
25    getting a lump-sum payment.
```

Page 40

```
 1              Johnson
 2       THE WITNESS:  And may I say, that's my
 3    understanding that's why there hasn't been any
 4    payment.
 5    Q.   So you are going to answer the
 6 question --
 7    A.   Well, no.  That's my understanding from
 8 your lawyers that you rejected that.
 9    Q.   Now, is there money for -- to pay Dover
10 Limited on a monthly basis?
11       MR. DAVIS:  Objection to form.  I mean,
12    how much money are you asking?
13       MR. MULLANEY:  Any money, Mr. Davis.
14    A.   At the moment, no.  What's happened in
15 the month of January is, we got hit with
16 substantial legal fees from our clearing broker
17 related to your actions against Watley, and we have
18 substantial legal bills from our counsel.
19    Q.   Uh-huh.
20    A.   We are spending enormous amounts in
21 legal expenses to combat what you're doing.
22    Q.   Uh-huh.
23    A.   If we had that money, we could pay Dover
24 Limited.
25    Q.   Uh-huh.
```

Page 41

```
 1              Johnson
 2       MR. DAVIS:  Also, I'd like to make clear
 3    for the record that legally speaking, okay, I
 4    want to make it clear that there is no
 5    suggestion or implication that Direct has any
 6    obligation to make payments to Dover.  Direct
 7    is not part of the settlement agreement and
 8    Direct does not -- is not obligated under that
 9    agreement to make any payments.
10       So to the extent your questions assume
11    or presume that there's an underlying
12    obligation for Direct to make those payments,
13    it is simply incorrect as a matter of law.
14       MR. MULLANEY:  Will that be the last
15    time you'll be restating your position on the
16    release, Mr. Davis?
17       MR. DAVIS:  I'm not restating the
18    position.  I'm telling you the black and white
19    of it, Mr. Mullaney.
20       Let me also tell you that in light of
21    the fact that not once, but twice, you have
22    improperly served restraining notices on
23    institutions such as banks and brokerage
24    houses that have relationships only with
25    Direct, that is a direct violation of the
```

11 (Pages 38 to 41)

**Janice Johnson**

Page 42

```
                    Johnson
1
2    judgment in this case, and we reserve our
3    right to seek sanctions and whatever other
4    remedies as a result of you trying to use the
5    judgment enforcement against a party that is
6    not the judgment debtor. It is improper.
7        MR. MULLANEY: You are mistaken. Is
8    there anything else?
9        MR. DAVIS: And let me further say that
10   although you are legally precluded because of
11   the release and the dismissal of the action
12   from even attempting to prove any alter-ego
13   relationship, even if it was not the case, you
14   could not unilaterally undertake these
15   enforcement efforts unless you first made that
16   as a matter of proof, which you certainly have
17   not done either.
18       MR. MULLANEY: Is there any other
19   rhetoric you have here today, Mr. Davis?
20       MR. DAVIS: I object to your
21   characterization, but I'm just letting you
22   know that a lot of your questions have been
23   improperly assumed that Direct is a judgment
24   debtor and I needed to say that for the
25   record.
```

Page 44

```
                    Johnson
1
2    customer-service guys.
3        Q.  If you could give me their names, that
4    would be helpful.
5        A.  I consult with Steven Malin, Pamela
6    Luteran and Ralph Armenti, who's now the president.
7        Q.  He's the president of what?
8        A.  A.B. Watley Direct.
9        Q.  What is Pamela Luteran's role at A.B.
10   Watley Group?
11       MR. DAVIS: I think that was asked and
12   answered, but...
13       MR. MULLANEY: You're mistaken.
14       A.  Basically, she is the comptroller that
15   pays the bills, that keeps the corporate records,
16   that reconciles what the inner-company obligations
17   are, because right now, Group owes a tremendous
18   amount of money to Direct.
19       Q.  Is Ms. Luteran an officer of Group?
20       A.  No.
21       Q.  Who are the officers of Group?
22       A.  Officers of Group are Steven Malin and
23   Robert Malin.
24       Q.  Is that written anywhere?
25       A.  Yes.
```

Page 43

```
                    Johnson
1
2        MR. MULLANEY: Well, why don't we do it
3    this way, which is the ordinary course in
4    depositions and what the rules are: When I
5    ask a question that you think is improper, you
6    state an objection, you instruct the witness
7    not to answer or say go ahead and answer and
8    then we continue. Would that be all right?
9        MR. DAVIS: I'm not going to take
10   directions from you, Mr. Mullaney.
11       MR. MULLANEY: Those are the rules.
12       MR. DAVIS: You have my objections on
13   the record. Let's proceed.
14       MR. MULLANEY: Again, over and over.
15       MR. DAVIS: Let's proceed.
16       Q.  Is the process you just delineated, Ms.
17   Johnson, is that written anywhere?
18       A.  No.
19       Q.  How do you know that is the process?
20       A.  Because that's one of the issues that I
21   have been to consult on, is how bills get
22   paid in a rational, timely fashion.
23       Q.  With whom do you consult on those
24   issues?
25       A.  Pretty much everyone except the
```

Page 45

```
                    Johnson
1
2        MR. DAVIS: I'm sorry, I didn't hear the
3    question.
4        Q.  Is that written anywhere?
5        A.  Yes. I've seen it in minutes.
6        Q.  When was Ralph Armenti made president of
7    Direct?
8        A.  Probably in the beginning of August of
9    '07. Somewhere around there.
10       Q.  Was that publicly announced anywhere?
11       A.  Beginning of September, sorry.
12           Well, it was told to the regulators. I
13   don't know -- I don't think there was any press
14   release or anything.
15       Q.  Is Robert Malin paid for his consulting
16   service to Group?
17       A.  Yes, he is.
18       Q.  How much is he paid?
19       A.  He is paid, under a contract, $200,000 a
20   year, as well as parking, as well as health
21   insurance, as well as cell phone, as well as life
22   insurance.
23       Q.  Who or what makes that payment to
24   Mr. Malin, Robert Malin?
25       A.  Again, it comes out of cash flows from
```

12 (Pages 42 to 45)